

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| OMPY HUDSON, III | * | CIVIL ACTION |
| VERSUS | * | NUMBER: 05-1939 |
| KIM SUSAN, INC. and<br>NABORS OFFSHORE CORPORATION | * | SECTION "L"(1) |

ORDER & REASONS

Before the Court are Nabors Offshore Corporation's ("Nabors") Motion for Summary

Judgment on its Cross Claim against Kim Susan LLC ("Kim Susan") (Rec. Doc. 53); Dominion

Exploration & Production, Inc.'s ("Dominion") Motion for Summary Judgment on its Cross

Claim Against Kim Susan and on its Third Party Complaint Against Northern Assurance

Company of America ("Northern"), Markle American Insurance Company ("Markle"), Certain

Underwriters at Lloyds London ("Lloyds") and Navigators Insurance Company ("Navigators")

(together, the "Underwriters") (Rec. Doc. 51); and Kim Susan and the Underwriters' Motion for

Partial Summary Judgment on Dominion's and Nabors' Cross Claims for Contractual Indemnity

and Third Party Demands for Insurance Coverage under Kim Susan's Protection and Indemnity

(" P&I") Insurance (Rec. Doc. 49). For the following reasons, Nabor's motion is GRANTED;

Dominion's motion is GRANTED IN PART and DENIED IN PART; and Kim Susan and the

Underwriter's motion is DENIED.

I.    **Factual and Procedural Background**

This case arises out of alleged injuries sustained by Plaintiff seaman Ompy Hudson

("Plaintiff") on March 27, 2005 while he was working aboard the M/V KRISTEN FAGAN, a

___ Fee_____<br>
___ Process_____<br>
_X_ Dktd_____<br>
___ CtRmDep_____<br>
___ Doc. No_____

supply vessel owned by his employer, Kim Susan. At the time of the accident, the M/V

KRISTEN FAGAN was performing services for Dominion alongside "Devil's Tower," an

offshore oil and gas platform located in the Gulf of Mexico off the Louisiana coast.[1] The

platform is owned by Dominion, and drilling operations were conducted at the platform by

Nabors pursuant to a Workover Daywork Contract between Dominion and Nabors.

According to the Plaintiff's Second Amended Complaint, as cargo was being transferred

from the vessel to Devil's Tower, vessel crew attempted to disconnect a hose used to transfer the

cargo. As the hose was lifted by a crane operated by a Nabors employee, the hose allegedly fell

and struck the Plaintiff, who was working on the vessel's deck. The Plaintiff claims that his

resulting injuries include a fracture to his right femur, among other injuries.

On May 25, 2005, the Plaintiff filed a complaint, with subsequent amendments, against

Kim Susan, Nabors and Dominion (together, the "Defendants") under the Jones Act, alleging

claims of negligence, unseaworthiness, and maintenance and cure. Dominion filed a cross claim

against Kim Susan and made third party demands upon the Underwriters, which include

Northern and Markle, Kim's Susan's P&I underwriters; Lloyd's, Kim Susan's Excess P&I

underwriter; and Navigators, Kim Susan's Bumbershoot underwriters. Through its cross claim

and thirty party demand, Dominion seeks indemnity and defense from Kim Susan and the

Underwriters for the Plaintiff's claims. Nabors also filed a cross claim against Kim Susan,

demanding indemnity and defense as Dominion's contractor. Kim Susan subsequently filed a

cross claim against Nabors and Dominion seeking tort indemnity for maintenance and cure paid

to the Plaintiff, as well as liability in the main demand.

---

[1] Specifically, Dominion hired the M/V Kristen FAGAN to deliver a shipment of the liquid substance chromium bromide to the Devil's Tower for a three day charter hire.

II.     **Motions For Summary Judgment**

On November 7, 2006, Kim Susan filed a Motion for Partial Summary Judgment on Dominion and Nabor's cross claims.  Nabors and Dominion filed Motions for Summary Judgment on their cross claims on November 7 and 13, 2006.  The crux of these three instant motions for summary judgment is whether a Blanket Charter Agreement ("Charter Agreement") executed by Kim Susan and CNG Producing Company ("CNG Producing") constitutes a written contract between Kim Susan and Dominion and consequently governs their relationship.  After the Charter Agreement's execution, CNG Producing's parent company was acquired by Dominion's parent company, and CNG Producing changed its legal name to Dominion.  The Charter Agreement, however, was never amended to reflect the name change, nor did either party provide the other with written notice of termination of the Charter Agreement.

At the time of the Plaintiff's March 27, 2005 accident, Kim Susan's M/V KRISTEN FAGAN was performing services for Dominion at Devil's Tower pursuant to a Dominion Purchase Order dated March 26, 2005.  Dominion and Nabors argue that the Charter Agreement remained fully in effect on the date of the accident as CNG Producing and Dominion are the same company, having undergone only a name change.  Thus, Dominion and Nabors argue that the Charter Agreement constitutes a written contract between Kim Susan and Dominion, entitling Dominion to defense and indemnity from Kim Susan and the Underwriters, and entitling Nabors, as Dominion's contractor, to defense and indemnity from Kim Susan.

Conversely, Kim Susan argues no contract between Kim Susan and Dominion exists.  Kim Susan claims that the Charter Agreement governed only the relationship between Kim Susan and CNG Producing, and the Agreement was terminated upon Dominion's parent's

acquisition of CNG Producing's parent company. Kim Susan states that no new written contract was executed between Kim Susan and Dominion, though the parties continued the business relationship that had been established between Kim Susan and CNG Producing. Kim Susan and the Underwriters dispute that the insurance policies issued to Kim Susan afford contractual liability coverage to Dominion because a written contract is a specified pre-requisite to coverage as an additional assured.

## III.    Motion for Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). The party that moves for summary judgment must demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party has carried this burden, the non-moving party must establish that specific facts exist which indicate a genuine issue remains for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 588 (1986). An issue is genuine if a rational trier of fact could find in favor of the non-moving party after review of the record. *Id.* In determining which facts are material, the court looks to the substantive law. "[F]acts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the non-moving party fails to carry its burden, summary judgment in favor of the moving party is appropriate.

With this standard in mind, the Court now turns to the merits of the three instant Motions

for Summary Judgment regarding Kim Susan's obligation, if any, to defend and indemnify

Dominion and Nabors, and the Underwriters' obligation, if any, to provide defense and

indemnity to Dominion.

**IV.    Law and Analysis**

    **A. Applicability of the Charter Agreement**

        **1. Terms of the Charter Agreement**

The Charter Agreement, entered into by Kim Susan and CNG Producing[2] on December 1,

1990, provides that Kim Susan will furnish services to CNG Producing for its maritime

activities, including supplying vessels suitably equipped to work in the offshore oil service

industry. (Charter Agreement Preamble). Vessels are to be supplied on an ongoing basis

whenever CNG Producing requires a vessel and Kim Susan has a vessel available for service.

(Charter Agreement § I). Vessel supply is also subject to agreement between Kim Susan and

CNG Producing regarding hire details, such as term and price, to be confirmed by a letter

agreement referencing the Charter Agreement. *Id.* The Charter Agreement applies to all vessels

supplied by Kim Susan to CNG Producing, as its terms and provisions are "applicable to each

and every vessel which OWNER [Kim Susan] delivers to CHARTERER [CNG Producing]."

(Charter Agreement § II).

Additionally, the Charter Agreement includes the following indemnity provision:

OWNER [Kim Susan] shall protect, defend, indemnify and hold harmless
CHARTERER [CNG Producing] and its agents, directors, officers, employees,
*contractors* and joint venturers and their respective underwriters (hereinafter
referred to as "Indemnified Parties") *from and against all claims, suits, losses,
liabilities, demands, costs, damages or expenses resulting from bodily injury to*

---

[2]CNG Producing is defined in the Charter Agreement to include its parent company,
affiliates and subsidiaries.

*or illness, loss of services or wages or death of third parties or the employees
of OWNER or its affiliated companies, contractors or subcontractors, which
may in any manner arise from, grow out of, or be connected with directly or
indirectly, this Agreement without limit and without regard to the cause or
causes thereof or the sole or concurrent negligence of the Indemnified Parties
or by any manner or thing for which strict liability might be imposed.*

(Charter Agreement § VII) (emphasis added).   Thus, Kim Susan must indemnify CNG Producing

and its contractors from certain claims, including a personal injury suit by an employee of Kim

Susan arising from a vessel charter.   The Charter Agreement also contains a provision requiring a

reciprocal indemnity obligation from CNG Producing, and both parties are required to procure

insurance naming the other as an additional assured, thereby supporting the indemnities they

provide to each other.   (Charter Agreement § XII and Ex. A).

As a blanket agreement, the Charter Agreement does not provide a termination date, but is

subject to automatic extension upon CNG Producing's request and Kim Susan's vessel availability.

(Charter Agreement § II).   However, the Charter Agreement may be terminated by each party upon

fifteen days prior written notice to the other party.   *Id.*   The Charter Agreement does not address

applicability to successors, but does provide CNG Producing with the right to assign the

Agreement in whole or in part with Kim Susan's written consent.   (Charter Agreement § XX).

### 2. Effect of the Stock Acquisition on the Charter Agreement

The Court next applies the uncontested facts to the Charter Agreement's terms and

provisions and to the relevant law.   In January of 2000, CNG Producing's parent company,

Consolidated Natural Gas Company, was acquired by Dominion's parent company, Dominion

Resources, Inc., through a 100% stock acquisition purchase.   CNG Producing's name was

subsequently changed to Dominion through the filing of a Certificate of Amendment of the

Certificate of Incorporation with the Delaware's Secretary of State on April 12, 2000.   Dominion

and Nabors argue that although the Charter Agreement was never amended to reflect the name change from CNG Producing to Dominion, Kim Susan and Dominion continued to do business after the company's name change from CNG Producing to Dominion, as evidenced by Kim Susan invoices addressed to Dominion, the Dominion on-hire/off-hire statement for the M/V KRISTEN FAGAN, and the Dominion purchase order to Kim Susan for the M/V KRISTEN FAGAN for services at Devil's Tower. Additionally, Dominion and Nabors state that Dominion sent annual certificates of insurance to Kim Susan using the Dominion address, and Kim Susan sent Dominion a liability insurance certificate listing Dominion as the certificate holder pursuant to the Charter Agreement's provisions.

Regarding the effect of Dominion's parent's stock purchase of Consolidated Natural Gas Company, both Dominion and Nabors contend that the only effect or change for purposes of the current dispute was the renaming of CNG Producing to Dominion. At no time did Dominion acquire the assets of, purchase, or merge with CNG Producing. Both before and after Consolidated Natural Gas Company's stock acquisition by Dominion Resources, Inc., all of CNG's Producing's Stock continued to be owned by Consolidated Natural Gas Company. Thus, Dominion and Nabors state that the larger transaction between Dominion Resources, Inc. and Consolidated Natural Gas Company had no affect on the property, rights and liabilities of CNG Producing, now known as Dominion, and all of the Charter Agreement provisions continued to inure to the benefit or liability of Dominion. (*See* Aff. of D. Malcolm Johns, Jr., General Counsel and Assistant Sec. to Dominion, Ex. F to Dominion's Mot. for Summ. J.). As evidence, Dominion and Nabors state that none of the 36 vessel operators with which CNG Producing had a contractual relationship prior to April 12, 2000 have executed new contracts with Dominion since that date. Dominion and Nabors

claim that as Kim Susan continued to accept payment and offer services to Dominion after the name change, Kim Susan cannot now contend that it was not governed by any operating agreements which pre-existed Dominion's name change from CNG Producing.

Conversely, Kim Susan contends that although it continued a business relationship with Dominion through the time of the Plaintiff's accident, the parties never negotiated a new contract between the time Dominion acquired CNG Producing's parent company through the stock acquisition and the time of the accident in March 2005.[3] Kim Susan argues that a plain reading of the Charter Agreement, drafted by CNG Producing, reveals that Kim Susan agreed to provide indemnity only to CNG Producing and its parent company, affiliates and subsidiaries. The Charter Agreement indemnity provision does not state that it will apply to successors or assigns, nor did the parties intend for the Agreement to apply to successors and assigns at the time of the Charter Agreement's execution. Moreover, Kim Susan claims that the consequence of Consolidated Natural Gas Company's acquisition by Dominion Resources, Inc. would serve to make Kim Susan's potential indemnity obligations under the Charter Agreement far more extensive in scope and more onerous than what it had originally agreed to with CNG Producing, as Dominion's parent company, affiliates and subsidiaries are much larger in size than CNG Producing's parent, affiliates and subsidiaries.

Dominion and Nabors cite to *In the Matter of Torch*, 1996 WL 185765 (E.D. La. Apr. 16, 1996), in support of their argument. In that case, the defendant indemnitor argued that a master work agreement ("MWA") did not apply to the work performed for plaintiff indemnitee TEPI

---

[3] After the accident, it appears that there was some communication between Dominion and Kim Susan regarding the negotiation of a new charter agreement containing a mutual indemnity provision. However, this fact has no relevance for purposes of deciding the motions presently before the Court.

because the MWA did not refer to TEPI, but rather referred only to Texaco Producing Inc.
However, the court found that the MWA did apply to TEPI because the two companies were one
and the same and the only difference resulted from a corporate name change subsequent to the
MWA's execution.  The court rejected the defendant indemnitor's argument, stating that "[t]o
claim that Torch, which had been doing work and accepting payment from TEPI since that name
change was unaware or that it abrogated the terms of the MWA is disingenuous at best...."  *Id.* at
*6.  The court stated that a "corporation, upon [a] name change in its name, is in no sense a new
corporation, nor the successor of the original one, but remains and continues to be the original
corporation."  *Id.* at 5 (quoting 6 W. Fletcher, *Cyclopedia of the Law of Private Corporations* §
2456 at 264-65 (rev. perm. ed 1989)).  The court also stated that "[t]he change of a corporation's
name is not a change in the identity of a corporation and has no effect on the corporation's
property, rights, or liabilities."  *Id.* (quoting *Alley v. Miramon*, 614 F.2d 1372, 1384 (5th Cir. 1980)
and citing *National Union Fire Ins. Co. v. Stauffer Chemical Co.*, 1991 WL 138431 (Del. Super.
July 15, 1991)).

The factual background in *In the Matter of Torch* can be distinguished from the present
case.  *In the Matter of Torch* did not concern a name change preceded by a 100% stock acquisition
of Texaco Producing Inc.'s parent company.  However, the case makes clear that the continued
acceptance of a business relationship and lack of objection by the party contesting an indemnity
obligation weigh heavily against the indemnifying party's later contention that it never agreed to
indemnify the other party.

As noted by Dominion and Nabors, Kim Susan and Dominion continued to do business
after the name change. Every year following the name change, Kim Susan sent certificates of

liability insurance to Dominion, using the same delivery address as CNG Producing, just as Kim

Susan did when Dominion was known as CNG Producing. (Ex. H. to Def. Dominion Mot. for

Summ. J.). Moreover, Dominion's purchase order for the services of the M/V KRISTEN FAGAN

at Devil's Tower specifically references a master services contract between the two parties. Kim

Susan accepted the purchase order, provided services and thereafter sent Dominion an invoice on

April 8, 2005. (Ex. E to Nabor's Mot. for Summ. J.).[4] At no time after the name change, for

which it received ample notice, did Kim Susan terminate the Charter Agreement by written notice.

Though Kim Susan states that the Charter Agreement's assignment provision voids the

contract as the stock acquisition resulted in an assignment to another party, this statement is legally

and factually incorrect. An anti-assignment clause in the context of a change of control effected

through a stock acquisition purchase is a non-issue:

> With respect to sales of stock, the prevailing view is that a transfer of stock ownership does not result in the violation of any anti-assignment provisions in the acquired company's contracts, absent particular language prohibiting "changes of control"...This is because changes in corporate ownership are not thought to vary that corporations's contractual responsibilities...Nor is the non-transferring party necessarily harmed by the transaction in that it can still obtain the same goods and services on the same terms it bargained for from the same entity with which it bargained.

Elaine D. Ziff, *The Effect of Corporate Acquisitions on the Target Company's License Rights*, 57

Bus. Law 767, 789 (Feb. 2002) (internal citations omitted).

A significant case on point is *Baxter Pharm. Prods., Inc. v. ESI Lederle, Inc.*, Civ.

---

[4] Specifically, on page 3 of the Purchase Order, a box is marked next to the following language:

> This purchase order is governed by a master service contract (MSC) between DEPI [Dominion] and vendor. The terms and conditions on the reverse side hereof supplement the MSC, provided the provisions of the MSC shall be controlling in the event of any conflict with such terms and conditions.

(Ex. E. to Nabor's Mot. for Summ. J.).

-10-

Action No. 16863, 1999 Del. Ch. LEXIS 47 ( Del. Ch. Mar. 11, 1999).  Though that case deals with Delaware law, its holding is relevant here.  In *Baxter*, the plaintiff executed a manufacturing and distribution agreement with the defendant, and the defendant thereafter sought to terminate the agreement based upon another company's stock acquisition of the plaintiff, which resulted in a change of the plaintiff's corporate name.  *Id.* at *6-7.  Otherwise, the company "remained intact and [was] basically the same company it was before.  *Id.* at *7-9 (stating plaintiff company retained same personnel, business operations and corporate policies; sold same product line; and defendant knew "at all relevant times" plaintiff company would be sold).  The defendant argued that the stock acquisition purchase violated the agreement's non-assignability clause, which is similar to the provision at issue in the present case.[5]  *Id.* at *14.  The court in *Batxer* held that the stock acquisition purchase did not violate the non-assignability provision and it rejected the defendant's contention that assignment meant "any transfer of control to a stranger."  *Id.* at *14-15.  The court stated that the word "assignment...is a legal term with an unequivocal, accepted definition."  *Id.* at *15 (quoting *Restatement (Second) of Contracts* § 317 (1981) ("An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance.")).  "Where an acquiror purchases the stock of a corporation,

---

[5]  Specifically, the non-assignability clause in *Baxter* provided as follows:

> During the term of this Agreement the rights of either party under this Agreement shall not be assigned, other than to Affiliates, nor shall the performance of either party's duties be delegated without the other party's prior written consent, except as to an Affiliate.  Notice of assignment other than to an Affiliate shall be given to other party at least thirty (30) days prior to the effective date of said agreement.

*Id.* at *6.  "Affiliate" was defined as "an entity that owns more than 50% of a contracting party's stock."  *Id.*

that purchase does not, in and of itself, constitute an 'assignment' to the acquiror of any contractual

rights or obligations of the corporation whose stock is sold." *Id.* at *16 (quoting several cases such

as *Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489, 494 (1st Cir. 1997), *cert. denied*,

521 U.S. 1120 (1997), which stated that "[a]bsent compelling grounds for disregarding its

corporate form a newly purchased company's separate legal identity and ownership of underlying

contracts survive without interruption notwithstanding repeated and even drastic changes in

ownership") (internal quotes omitted)).

Like *Baxter*, the assignment provision in this case does not contain any language

prohibiting stock acquisition or a change in ownership of either party. *See Baxter*, 1999 Del. Ch.

LEXIS 47, at *15. If the parties had such an intention, they should have included the relevant

language in the Charter Agreement. *Id.* But they did not. To follow down the path of Kim Susan's

argument implies that every time a parent company is acquired through a stock acquisition

purchase, the contracts of all subsidiaries become void automatically upon the parent's acquisition

simply due to the parent company's change in ownership. Moreover, it would suggest that every

time a company expands or grows in assets, employees, etc., all indemnity agreements with other

parties could be subject to automatic termination. The Court declines to follow this line of

reasoning.

Regarding, Kim Susan's argument that it became exposed to a greater scope of liability, if

the issue arose as to whether Dominion's parent or one of Dominion's parent's subsidiaries was

entitled to receive indemnity based upon the Charter Agreement indemnity provision, the result

may turn out differently because the Dominion parent or another Dominion parent subsidiary was

not the intended beneficiary of the Charter Agreement. The law requires indemnity provisions to

be strictly construed, so Kim Susan may not be exposed to more liability than for which it contracted. This, however, is not the case presently before the Court. Neither Dominion Resources, Inc. nor any affiliate or subsidiary of either Consolidated Natural Gas Company or Dominion Resources, Inc., other than Dominion, is being sued or requesting indemnity and defense. The indemnity and defense claim comes from the same party who hired Kim Susan to perform services and the same party Kim Susan contemplated when it executed the Charter Agreement. Dominion runs the same business operations at the same facilities with many of the same employees as before when it was known as CNG Producing, and Kim Susan continued its business relationship with Dominion for several years after the stock acquisition.

Accordingly, providing defense and indemnity to Dominion and Nabors was certainly within the reasonable contemplation of the parties when they executed the Charter Agreement and thereafter. The Charter Agreement constitutes a written contract between Kim Susan and Dominion, in effect at the time of the Plaintiff's accident.

### B. Whether the Indemnity Provision Applies and Dominion and Nabors Are Entitled to Indemnity and Defense From Kim Susan

Having determined that the Charter Agreement applies, the Court looks to whether its indemnity provision provides coverage to Dominion and Nabors for the Plaintiff's claims. The Court applies federal maritime law to interpretation of the Charter Agreement's provisions in accordance with the Charter Agreement's choice of law provision (Charter Agt. § XXIV), and Fifth Circuit precedent. *See, e.g., Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 530 (5th Cir. 1986). Under federal maritime law, "[a]n indemnity provision should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties." *Id.* at 36 (internal quotes omitted). However, an indemnity contract "should not be read

to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." *Id.* at 37 (citing *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir. 1981)).

Here, it is clear that Kim Susan agreed to provide indemnity and defense to both Dominion and any of its contractors for a personal injury claim filed by one of Kim Susan's employees which arose from vessel services under the Charter Agreement. Moreover, the Charter Agreement indemnity provision clearly states that this provision applies regardless of concurrent negligence on the part of Dominion or its contractor and regardless of any strict liability provision. Accordingly, the personal injury claim of the Plaintiff, a Kim Susan employee, who was performing services aboard the vessel at the time of the accident, is covered under the Charter Agreement's indemnity provision. Therefore, Dominion and Nabors are entitled to defense, protection, indemnity and to be held harmless by Kim Susan from and against the claims asserted by the Plaintiff.

**C. Whether Dominion Qualifies as an Additional Assured Under the Insurance Policy**

The Court next turns to whether the insurance Kim Susan was required to procure pursuant to the Charter Agreement covers Dominion as an additional assured, so that Dominion is entitled to summary judgment on its third party demand against the Underwriters. Dominion claims that it qualifies as an additional assured under the blanket additional assured clause contained in the P&I, Excess P&I and Bumbershoot insurance policies issued jointly to Kim Susan under policy number GCM 05503 (the "Policy").

The Court applies state law to interpretation of the Policy, as a federal district court looks to state law when examining the provisions of a marine insurance contract, absent a specific and

controlling federal rule. *Albany Ins.Co. v. Anh Thi Kieu*, 927 F.2d 882, 886 (5th Cir. 1991) (citing

*Ingersoll-Rand Financial Corp. v. Employers Ins. of Wausau*, 771 F.2d 910, 912 (5th Cir. 1985)).

As Louisiana has the greatest interest in resolution of the issue in question, and the insurance

contract was issued and delivered there (*see* Policy), the Court applies the law of that State to the

present dispute. *See Albany Insur.*, 927 F.2d at 890-91.

Under Louisiana insurance law, an insurance policy constitutes an agreement between the

parties and should be interpreted using ordinary contract principles. *Reynolds v. Select Props.,*

*Ltd.*, 93-1480 (La. 4/11/94), 634 So. 2d 1180, 1183. Thus, if the words of the policy are clear,

unambiguously express the parties' intent, and lead to no absurd consequences, the contract must

be enforced as written. *Cent. La. Elec. Co. v. Westinghouse Elec. Corp.*, 579 So. 2d 981, 985 (La.

1991).

The Policy contains the following relevant provisions:

PROTECTION AND INDEMNITY

The Assurer hereby undertakes to make good to the Assured or the Assured's
executors, administrators and/or successors, all such loss and/or damage and/or
expense as the Assured shall as owners of the vessel named herein have
become liable to pay and shall pay on account of the liabilities, risks, events
and/or happenings herein set forth:

Loss of Life, injury and illness

1) Liability for loss of life, or personal injury to, or illness of, any person...
Protection hereunder for loss of life or personal injury arising in connection
with the handling of cargo of the vessel named herein shall commence from the
time of the receipt by the Assured of the cargo on the dock or wharf or on craft
alongside the said vessel for loading thereon and shall continue until delivery
thereof from dock or wharf of discharge or until discharge from the said vessel
on to another vessel or craft.

...

Costs and charges

-15-

14) Costs, charges, and expenses, reasonably incurred and paid by the Assured in defense against any liabilities insured against hereunder in respect of the vessel named herein, subject to the agreed deductibles applicable, and subject further to the conditions ad limitations hereinafter provided.

(Policy, Protection and Indemnity).

...

### BLANKET ADDITIONAL ASSUREDS AND WAIVER OF SUBROGATION

Privilege is hereby granted the Assured to name others for whom the Assured is performing work as Additional Assureds on this Policy provided the Assured shall have exercised this option prior to loss. Privilege is also granted the Assured to release from Liability others for whom the Assured is performing operations, or who are performing operations for the Assured, provided the Assured shall have exercised this option prior to loss; and these insurers waive all rights of subrogation against any parties so released. Any phraseology required to be incorporated in this Policy by parties favored by the Assured with one of the above options shall be deemed to be incorporated herein, but to no greater than the privilege allowed by the above options.

(Policy, General Conditions Applicable to All Sections). In order for a party to qualify

as an "Additional Assured" under the Policy, the "Assured" and the party seeking

coverage as the Additional Assured must agree to this liability extension in writing.

Specifically, the Policy provides:

### CONTRACTUAL LIABILITY EXTENSION

In consideration of the premium charged for this insurance, the coverage afforded under this policy is extended to insure the liability of the assured arising out of hold harmless and/or indemnity agreements contained in such contracts that have been into by the Assured for the furnishing of vessel services.
The coverage afforded by this contractual liability extension applies only to written contracts which have been entered into by the Assured prior to an accident/occurrence giving rise to a claim hereunder.

(Policy ¶ PI).

-16-

The Policy language in this case is clear and unambiguous.  As the Charter Agreement was executed and the hiring of the vessel M/V KRISTIN FAGEN occurred before the accident, the accident involved a personal injury which "arose" as cargo was in the process of being transferred from the vessel to the platform, and the Charter Agreement constitutes a written contract governing Kim Susan and Dominion's relationship, Dominion qualifies as an additional assured under the Policy issued to Kim Susan, entitling Dominion to defense and indemnity from the Underwriters.

### D.  Whether Dominion is Entitled to Attorneys' Fees and Bad Faith Damages from the Underwriters

Dominion further states that it is entitled to attorneys' fees and bad faith damages in the sum of 50% of the amount owed by the Underwriters pursuant to La. Rev. Stat. 22:658B(1) because the withholding of coverage was arbitrary, capricious and without probable cause as there was no reasonable basis for the refusal of coverage.

For a claimant to prevail under La. Rev. Stat. 22:658B(1), he or she must demonstrate:

> that the insurer received satisfactory proof of loss, failed to pay the claim within the applicable statutory period, and that the failure to timely tender a reasonable amount was arbitrary and capricious....Satisfactory proof of loss within the meaning of the statute is that which is sufficient to fully apprise the insurer of the insured's claim.

*Maurice v. Prudential Ins. Co.*, 831 So.2d 381, 388 (La. App. 4 Cir. 10/23/02).

"Statutory penalties are inappropriate when the insurer has a reasonable basis to defend the claim and was acting in good faith reliance on that defense." *Id.* (internal citations omitted); *see also New York Marine and Gen. Ins. Co. v. McDermott Int'l, Inc.*, 2005 WL 1400450, at *5 (E.D. La. June 1, 2005) ("When an insurer has legitimate doubts about coverage for a particular claim, the insurer has the right to litigate such a questionable claim without being subjected to

damages and penalties.").

In this case, Dominion states that it provided Kim Susan and the Underwriters' counsel with a copy of the certificate of name change on March 29, 2005, two days after the Plaintiff's accident.  The parties did not present arguments to the Court on this issue during oral argument. Because the Court determines that it requires more information on this issue, summary judgment regarding whether Dominion is entitled attorneys' fees and bad faith penalties is not appropriate at this time.

## V.      Conclusion

Accordingly, Dominion's Motion for Summary Judgment is hereby GRANTED IN PART and DENIED IN PART,  Nabor's Motion for Summary Judgment is hereby GRANTED, and Kim Susan's Motion for Partial Summary Judgment is DENIED.

New Orleans, Louisiana, this 5th day of April, 2007.

UNITED STATES DISTRICT JUDGE